We'll proceed to the case of Southeastern Illinois College v Workers' Compensation Commission, 5100585. Counsel, please. Your Honor, Counsel, I'm Jim Gallin, representing the employer appellant, Southeastern Illinois College. The petitioner suffered back injuries and left him with work restrictions. He engaged in a self-directed, unfocused, and unsuccessful job search. When offered vocational rehabilitation services, he refused to participate. The arbitrator awarded 40 percent permanent partial disability to the petitioner. The commission increased the award by extending the temporary total to the date that he stopped his job search and increased the permanency to 70 percent of the petitioner. The circuit court found, quote, petitioner has proven by a preponderance of the evidence that he has not completely and wholly incapacitated to work, but that his handicap is such that he cannot be employed in any branch of the labor market. Appellant contends that the circuit court erred in finding that the commission's decision is contrary to the manifest weight of the evidence. There are two glaring errors in the circuit court's decision. First of all, after stating that the issue is whether the commission's decision is against the manifest weight of the evidence, it then reverses merely on the basis of the preponderance of the evidence. It doesn't give its support for its decision that it was against the manifest weight of the evidence. Secondly, he states that, quote, petitioner proved and the commission concurred that he conducted a diligent but unsuccessful job search, or work search, end quote. In fact, the commission never said that the search was diligent. It described it as extensive but never diligent. In fact, the decision finding permanent partial supports the proposition that the commission found that it was not diligent just based on the decision to which it came. So basically you're saying the circuit court acknowledged that the issue before was whether the commission's decision was against the manifest weight of the evidence, but somehow then outlined the evidence and found that the claimant's evidence was more extensive and persuasive than the employer's evidence. So it confused the standard, basically. That's part of it. Yes, Your Honor. The record report supports the commissioner and, for that matter, the arbitrator's conclusion that the petitioner did conduct an extensive job search. But even within that job search, the overwhelming percentage of the cases that he had listed were ones that were not hiring. One, we know that he was going beyond just the ones that were listed in the newspaper, but you would think that if he was really checking the newspaper, really trying to find places that were looking for bad openings, he would have done better than he did. The arbitrator stated and the commission accepted that, quote, probably over 95% indicated that they were not hiring. I think that supports the conclusion that it wasn't a diligent job search, even though it was extensive. The commission's decision is kind of confusing, to agree with that, as far as how it's written. I mean, they only talk about the job search in the context of TTV maintenance. Then when they get to the part about permanent partial versus permanent total, they don't really talk about the job search anymore. Do you read it that way? No, I don't think it's confusing, Your Honor. I think when a commission, court, or whatever, writes a decision, there is a presumption that even if they don't mention specific things, they did find the things that are necessary to reach the conclusions they did. So you would say that in the context of permanent total, they didn't discuss whether he made a diligent job search. They only discussed whether he qualified under other criteria and adopted the arbitrator's decision. Well, and I think the fact that they came to the conclusion that they did supports the idea that they did not find him diligent, and I think it's well supported by the evidence. When professional services were offered in January 2008, it took numerous calls before a meeting could be set up in April of 2008, calls and letters. At the meeting, the petitioner was described as, quote, defensive, hostile, and inappropriate. The petitioner admitted readily that he chose not to meet with the vocational counselor again. I believe that's another sign of lack of due diligence. If you have a serious problem and you're offered professional help, diligence requires that you accept it, not that you just blow it off and go on with your own self-medication or self-representation, in this case, unfocused, unassisted job search. It's the petitioner's duty to prove the elements of his case. We believe that the facts recited prove that he did not. As court found, he is not completely and wholly incapacitated from work, he did not present expert testimony of unemployability, and the commission's conclusion that he failed to prove diligent job search is supported by the evidence. That's enough to compel affirmance of the commission's decision. But the appellant went further. It presented the evidence of Adrian Boyd, a vocational consultant, that the petitioner is employable, that positions exist in the area on a regular and consistent basis within the available labor market that he could do, vocational rehabilitation services were offered, he chose not to avail himself of them. That is further evidence in support of the commission's decision. We believe on the record the commission's decision is supported by the evidence and the circuit court's decision must be reversed and the commission's decision must be reinstated. Thank you. Counsel, please. May it please the court. Mary Massa here for the employee, William Schell. The sole issue that was before the circuit court in Saline County was whether or not the employee qualified under the odd-lot category for a permanent total disability award. The commission's decision made several findings that had to do with my client's job search. And as you know, in the initial burden of production, the employee can prove that he qualifies for that odd-lot category by one of two alternate means, one of which is to show that he made a diligent but unsuccessful attempt to find work, and second by showing because of his age, skills, training, and work history, he will not be regularly employed in a well-known branch of the labor market. Did the employee cooperate with Ms. Boyd? Your Honor, there were findings made in the commission's decision with regard to that. And I think he went to an initial meeting with Ms. Boyd, yes, Your Honor. But afterwards found that he did not believe he was getting a fair shake. And that is likely because Ms. Boyd was telling him he could do a job as a security guard or he had transferable skills that would allow him to do jobs which he believed conflicted with his physical limitations that were put in place by Dr. Wayne. He was also on pain medication, Lortab, three times a day. Ms. Boyd didn't consider that in any of her discussions with him. Well, did she after she talked to him and worked with him, did she try to contact him? I believe there were, and I'm not for sure, Your Honor. I thought the record showed that she did, and the claimant simply wouldn't respond. And no doubt he was frustrated, Your Honor. Was he frustrated in trying to get benefits? Mr. Schell's benefits were cut off by this employer in 2005, 2006, excuse me, February of 2006. He had already at that point conducted an independent job search for the period of June of 2005 up until that point. From that point until March of 2007 when he finally, after 754 job searches, decided it was a futile attempt to find a job. Then, and not for almost a year after that, did he get contacted by the respondent to try to set up a meeting with a vocational rehabilitation specialist? And this is, I think, part of the problem. Well, it is a problem for him, though, isn't it, too, because he was offered professional help, which he refused. We don't know. Maybe she would have found him a job. And perhaps in June of 2005, after he was found to be at MMI by Dr. Wayne and began his job search, if he had been assisted in that job search by the respondent then, perhaps he would have been a little bit more cooperative. But look at what this man did. Despite being cut off on TTD or maintenance, he continued to do a self-directed job search by whatever means he knew possible. Who were the people that he tried to contact? Were they people that were hiring? There were instances of 13 jobs where they were, in fact, advertising that they were hiring. And he went to each of those, and he was turned down at each of those positions. How many did he say went to see? 754 job searches, Your Honor. So 13 of them were hiring? 13 were hiring, yes, Your Honor. But look at the job market, too. I mean, it's not just these transferable skills. You're also looking at the southern Illinois and western Kentucky area where this petitioner lived. This is a depressed area, and that also has to be considered by this vocational rehabilitation specialist. And it should have been considered by the respondent and given him help with that vocational rehabilitation well before January of 2008. This is a manifest wait standard. Is it within the commission's discretion to decide that refusal to cooperate with professional vocational help demonstrates a lack of due diligence? I don't think it has to do with the lack of due diligence. It has to do with that second prong, when you move the burden of production to the employer. But with regard to the first prong, Your Honor, the employees. Well, the second prong was them demonstrating that work was available. But, I mean, now we're talking about him refusing to let them try to find a job. And in terms of the diligent job search, there never was anything specifically said by the commission. One way or another, that the petitioner did do a diligent but unsuccessful job search or didn't do a diligent job search. They adopted, except as modified in their opinion, they adopted the decision of the arbitrator, who did say it was not a diligent job search. But they did also make further findings with regard to the fact that the respondent did not assist in that job search. On the issue of maintenance. Yes, Your Honor. And the commission said plaintiffs should not be penalized for doing an extensive job search effort. And this is what I argued to the circuit court. That the petitioner shouldn't have had to prove both prongs. If the petitioner proved to the commission that he did a diligent but unsuccessful job search, then you go to the next prong, which is the employer's burden. But instead, the commission went and analyzed the second prong of that. So, you can't have it both ways. You can't say there was no finding by the commission that he made a diligent job search, but then go on to the next prong, or that he didn't do it. There had to have been a finding with regard to that diligent job search. You can't just ignore that. And because of that, the circuit court agreed with my argument that that was a legal analysis error on the part of the commission. Well, Mr. Gallin was arguing that they must have decided it wasn't diligent because they didn't award the PTD and they sustained the PPD award. Well, I don't agree with that. I believe the specific findings that the commission made with regard to that diligent job search and how it was impacted by the respondent's failure to get involved with vocational rehabilitation until well after the fact. And because of that, they awarded maintenance for that time period. That is correct, Your Honor, for the period through March 1st of 2007. But my argument to the circuit court was that the commission made a legal determination that it was a diligent job search, and so therefore we go on to the next prong of the attack, which is whether or not the employer has showed that the claimant is employable in that stable labor market and that that market exists. And that is the area where the circuit court made findings on a manifest weight of the evidence and said that the plaintiff's evidence was far more extensive and far more persuasive than the defendant's evidence from their vocational rehabilitation specialist, Ms. Boyd. Is that the standard on manifest weight? It would be the standard on the employer's work. Which side's evidence was more extensive or persuasive? Well, in terms of whether you can reverse on a manifest weight finding by the commission, the clearly evident plain and indisputable weight of the evidence compels an opposite conclusion, and that's what the circuit court found, that the weight of the evidence was way more extensive and persuasive on the employee's side than it was on the employer's side. And that's what we're asking you to affirm in this case. Again, the evidence with regard to Ms. Boyd was she found that he could do a security job as a security officer, but he was found incapable of returning to any kind of work that involved working with inmates, which was his prior job. She also said that despite some of the jobs she suggested he could perform, they would be conflicting with his permanent medical restrictions, and she said, well, he can just ask for accommodation. Well, the commission recognized that that was not logical, and so did the circuit court. So on top of that, when you look at the vast majority of the job contacts that my client made, being in retail, which was one of the big things that she had in her transferable skills, because he did have some prior retail experience before he went to work in the building trades profession and then on as an instructor, that was a transferable skill, yes. But did it conflict with his medical restrictions? Yes. Yes, it did. And Ms. Boyd didn't address that other than to say, well, he can ask for accommodations, but that doesn't make that job suitable, and that's the standard. Is that job suitable? Is he qualified for it? Will he seriously endanger his health or his safety if he tries to perform a job by that? How do we determine that? We look at what his physical restrictions were, and those were the restrictions that were put in place by Dr. Wayne, who was the physician that the respondent had examined him throughout the course of the case. And not only that, Dr. Wayne was the one that prescribed the Lortab for him three times a day, three times a day for narcotic medication. Here's a man who went into this appointment with Ms. Boyd, letting her know that his pain complaints from day to day were between a 7 and a 10. Sometimes he had difficulty even getting out of bed in the morning. Did it show that he didn't even look for employment for 21 months prior to the altercation hearing? From March 1st of 2007 until the arbitration hearing, yes, Your Honor. He discontinued his job search after 754 attempts and did not do any further job search. Yes, Your Honor, that is correct. So we are asking that the Salem County Circuit Court's decision of November 30th, 2010, be affirmed. Unless there are any other questions, I thank you. Thank you, counsel. Counsel, Mr. Petalini, would you like to? Yes, Your Honor, just to answer your question. The meeting was in April, I think the 18th. On June 11th, Adrian Boyd sent the petitioner a letter saying, I have been asked to provide vocational rehabilitation services to you. I have attempted to contact you by telephone and have been unable to get an answer, nor have I had the opportunity to leave a message. So yes, she did try by both telephone and letter and got no response. Other than that, I think our position stays the same. The Commission clearly considered all the evidence and found that he failed to prove that he was an odd lot of permanent total. And the court didn't say that it was against the manifest way, just they thought it was a preponderance. But we think the Commission's decision is something which must be reinstated. Thank you, counsel. Thank you. The court will take the matter under advisory for disciplination.